IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON SPATES, | ) | Case No.  1:16 CV 1262 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| SHAE HARRIS, Warden, | ) | THOMAS M. PARKER |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |

## I.      Introduction

Petitioner Brandon Spates seeks a writ of habeas corpus under 28 U.S.C. § 2254,
claiming that his convictions and sentences in *State v. Spates*, Case No. CR-13-576749-A
violated his constitutional rights.  ECF Doc. No. 1.  Warden  Shae Harris,[1] the respondent, has
filed a return of writ.  ECF Doc. No. 9.  And Spates has filed a traverse.  ECF Doc. No. 11.

The matter is before the undersigned by an automatic order of reference under Local Rule
72.2 for preparation of a report and recommendation on Jones's petition or other case-dispositive
motions.  Because Spates' sole claim for relief lacks merit, I recommend that the Court DENY
his petition on the merits.

## II.      Factual Background

The Ohio Court of Appeals summarized the evidence presented at Spates' trial:

---

[1]  Shae Harris is the acting warden of Warren Correctional Institution, where Spates is incarcerated.  ECF
Doc. No. 1 at Page ID# 1.

{¶ 3} In the late evening of July 29, 2013, Spates was observed driving a black Buick speeding up and down East 133rd Street near Woodworth Avenue. Taqwaya Martin, Dalesha Bugg, Ouida Shields, and Jermaine White, whose street name is "Polo," were standing outside when Spates stopped the car in the street in front of Martin's grandmother's house. According to Martin, Spates was not acting like himself—yelling and starting an argument with Polo.

{¶ 4} Shields testified that Spates appeared hyper, agitated, and was threatening to "kill people." Even though Spates was told that Polo did not want any problems and did not have anything against him, Spates kept saying that he was not threatened by Polo. According to witnesses, Spates announced he was going to get his friends and that he would be back. After this confrontation, Shields left the scene with Bugg and Polo.

{¶ 5} Christian Hardrick testified that he received a phone call from a distressed sounding Spates, who said he was coming over to pick him up. When Spates arrived, he was riding in a black Buick LaCrosse being driven by another friend named Chris. According to Hardrick, it was his understanding that they were going to fight some guys on Woodworth who said something to Spates.

{¶ 6} Martin testified that while she was at the store, she saw Spates's vehicle go by with a white Honda following. By the time she arrived back to her grandmother's house, Spates was already there with his friends. Martin walked up to Spates and told him to "get that from over here" and in response, Spates put a gun to her head. Martin testified that she was "fired up" when she saw the gun because Spates's actions were completely out of his character. She could not describe the gun because she felt she blacked out from the situation, but knew it was a handgun.

{¶ 7} Hardrick testified that when he heard yelling and saw guys coming from the house on East 133rd, he and Chris exited the car, thinking they were about to fight. Instead, Hardrick was able to get Spates back in the car and they drove off. Hardrick denied seeing Spates with a gun.

{¶ 8} As they drive down Hayden Avenue, near Glenside Road, Spates got out of the car and ran toward Woodworth. Chris and Hardrick parked the car on Glenside and then ran around the corner to Woodworth. As they approached the corner, they saw Spates standing at the end of East 135th yelling out "where you all at" and "what you all do now." Spates and Chris were standing together when their attention turned toward East 135th. Hardrick testified he heard words being

2

exchanged, followed by gunfire from East 135th. He saw Spates remove a gun from his hip and point it across the street toward East 135th. Hardrick described the gun as a handgun, but not a revolver. According to Hardrick, the gun did not fire, but Spates and Chris were attempting to shoot toward East 135th and people were shooting from East 137th. Hardrick opined that the gun must have been jammed.

{¶ 9} Hardrick turned away from Spates and was attempting to run away when he heard three consistent shots from the distance and then he was shot in the right shoulder. As he looked back toward where Spates and Chris were, he saw them running away toward East 133rd. He yelled at them that he was hit, but they kept running, which made him upset.

{¶ 10} Prior to the shooting, Hardrick considered Spates to be like a brother to him, however that relationship changed because "no brother would had let me lay there period." Hardrick testified that he was emotionally hurt when Spates left him because Spates was the reason why he was there. He did not want to testify because he "wanted to leave him hanging," which is why he had to be arrested to come to court and testify.

{¶ 11} According to Hardrick, Tiffany Jones came out of her apartment building and took some marijuana from him prior to the police arriving. When the police responded they asked him who shot him. He pointed to the direction of East 137th because the bullet entered from the front of his shoulder, causing him to stumble backwards, and he was facing toward East 137th when he was shot. According to Hardrick, it would have been impossible for Spates to shoot him because Spates was behind him. Hardrick denied having a firearm on him that night or that he was firing a gun.

{¶ 12} Dalesha Bugg testified that after the earlier confrontation with Polo, she left with Shields and Polo. They dropped Polo off at his sister's house because "he had to go do something," and she and Shields went to the store. As they were sitting in Shields's truck in a parking lot on Woodworth Avenue between East 135th and 137th, she saw Spates with a gun with two other guys. Bugg called out Spates's name, telling him not to shoot. According to Bugg, she and Spates were "eye to eye" and the gun Spates was holding was a "black 9 with a clip." She testified that she did not see Spates point the gun at anyone, but was pointing the gun across Woodworth.

3

{¶ 13} Bugg stated that after she heard about 8 or 9 gunshots, she ran and hid in the bushes. According to Bugg, the shots all sounded different because Spates and his friend who was shot were standing "maybe 2 feet apart shooting toward the field." She further testified that "they were looking for the boys, Polo and them." Although she denied seeing Polo there, she admitted it was dark out when the shooting occurred. After the shots, she did not see where Spates went, but saw his friend on the ground holding his stomach. On cross-examination, she admitted she did not see who shot Hardrick, however "someone told her that Spates shot his own friend."

{¶ 14} Ouida Shields testified that after leaving East 133rd, she drove Polo, the father of her child, to East 137th and she saw him walk through the field to go to the store on the corner of East 137th and Woodworth. Shields parked her truck in a lot facing Woodworth between 135th and 137th, and she and Bugg walked through the field to the store. According to Shields, she and Bugg saw Polo and told him that he should leave because Spates stated he was going to get his friends. Shields testified that when she and Bugg left the store, she saw Polo in the field area between East 135th and 137th.

{¶ 15} When they got back to her truck, she saw three men running with guns in their hands through the field. She testified that Spates ran up to the truck and Bugg jumped out telling Spates not to shoot her. According to Shields, Spates told Bugg to get out of the way because some people "about to die." After Bugg ran off, Spates ran up to the truck pointing the gun and asking "where is the n* * * as at now?" Shields told the jury that Spates was looking for Polo. Spates then ran towards Woodworth while firing his gun. She testified that she heard a lot of gunshots in front of her, but did not see anyone get shot.

{¶ 16} After the gunshots stopped and the police and ambulance arrived, Shields tried calling Polo. When she could not reach him, she thought Polo was the one who was shot because the ambulance responded to the corner of Woodworth and East 137th, which was the area where she last saw Polo. She was finally able to reach Polo on his phone and he told her that he was on East 133rd and Shaw Avenue.

{¶ 17} Shields drove over to Shaw and picked up Polo and his friend, Steve. After leaving, she noticed a car with its lights off speeding up behind them. She looked in her rearview mirror, and realized the car was Spates's car and he was pointing something at them. She thought she heard Spates shooting at her car. Shields continued to drive over to Woodworth where she knew the police were. When she

4

pulled into the driveway area, the police immediately ordered the occupants of Shields's vehicle out of the truck. Shields told them about the black Buick following them and the driver pointing the gun out the window at them.

{¶ 18} Carolyn Woodson testified that she lives on Woodworth and knows Spates. During the late hours of July 29, 2013, she heard guys arguing next to her building. She recognized some of the individuals, including Spates and Polo. She stated that Spates walked away, but about 20–30 minutes later, she heard arguing again. She looked outside and saw a couple of guys running toward her parking lot, whom she recognized had been with Spates earlier. Then she saw Polo and Steve with another person running across the street and stopping under a light. Woodson saw Polo's hand go up and saw a spark, then saw a guy fall to the ground holding onto his shoulder. She testified that she only heard one gunshot that evening.

{¶ 19} Woodson testified that Spates was not around when the shooting occurred. She admitted that she did not tell the officers that evening that she saw Polo shoot the victim because she was fearful of Polo. She testified that after the shooting Polo and his friends threatened both her and her neighbor Tiffany Jones.

{¶ 20} Jones testified that she lives on Woodworth and considers Spates a brother. That evening, she heard arguing outside of her house. She saw Polo and his friends standing outside her building and Spates walking and saying, "You all going to kill me. I'll die tonight." She then heard the sound of gunshots with three or four shots coming from the field across the street on East 137th. She saw Hardrick get shot in the arm in her driveway, but did not see the shooter. She stated the last time she saw Spates was on East 135th and Woodworth when he was arguing with someone. After Hardrick was shot, she took a bag of marijuana from him; she denied taking a gun from him.

{¶ 21} East Cleveland Police Officer David Perlmuter testified that he responded to a disturbance on East 133rd on July 29, 2013. Upon arrival he learned that 20 or 30 seconds prior to his arrival, there were males on the street waving guns. Moments later he received a radio broadcast from then Officer John Donitzen of shots fired. Officer Perlmuter drove north on East 133rd and then turned onto Woodworth. He testified that he did not see anything until he received a call for a "male down" at East 137th and Woodworth. When he arrived, he observed a male with a gunshot wound to his right shoulder. According to Officer Perlmuter, Woodson and Jones, who were with the victim, were "sketchy"—meaning that

5

they were not sure who did what or what they saw. Neither identified who shot the victim.

{¶ 22} After taking statements from both Woodson and Jones, Officer Perlmuter walked the crime scene perimeter that was established on Woodworth from the corner of East 137th midway to East 135th. He walked the entire perimeter looking for prints, weapons, shell casings, and tracks, but did not locate any evidence. He admitted that he did not search the area directly off East 135th.

{¶ 23} Thereafter, he patrolled the area and as he drove closer to Hartford Road, he saw headlights in his rearview mirror and heard a car horn. He pulled over and spoke with the occupants of a white SUV. As a result of the conversation, he looked in his rearview mirror and saw a black Buick heading southbound on East 133rd at a high rate of speed turning onto Hartford.

{¶ 24} Officer Perlmuter pursued the vehicle and observed the vehicle speed up dramatically. He activated his lights and sirens, but lost sight of the vehicle for about five seconds on Hartford. As he was making the turn, Officer Perlmuter observed the vehicle turn onto Milan Avenue and then pull over.

{¶ 25} The driver of vehicle was identified as Spates and was arrested without incident. Both the vehicle and Spates were searched, and nothing was discovered. Officer Perlmuter testified that it was discovered that Spates was directly involved in the shooting that happened on East 137th and Woodworth.

{¶ 26} Deputy Sheriff Donitzen testified that on the night of July 29, 2013, he was an officer with the East Cleveland Police Department and received a radio call for a disturbance where a person pointed a gun at a female on East 133rd. Upon arrival, he received information from Officer Perlmuter that the suspect had left the scene in a black four-door vehicle. Deputy Donitzen patrolled the area for the suspect.

{¶ 27} As he was driving north on East 135th, he heard several gunshots coming from East of his location toward East 137th and Hayden. When he traveled up East 135th he did not see anyone in the field nearby or see anyone running from Woodworth near East 135th.

{¶ 28} Deputy Donitzen testified that he approached the victim and observed a gunshot entrance wound on the front deltoid area of the victim's right shoulder and an exit wound on his rear deltoid of right shoulder. Donitzen testified that the

victim stated that he was walking north across Woodworth when a group of unknown males were firing guns between the area of East 135th and 137th.

{¶ 29} East Cleveland police officer Joe Dunlap testified he and his partner responded to the area of East 137th and set up a crime scene perimeter based on the information received by Officer Donitzen. During his search for evidence, no gun or shell casings were discovered. However, he observed a white SUV stop nearby. After talking with the occupants of the vehicle, he learned that the person brandishing a firearm on East 133rd was also involved in the shooting on Woodworth.

{¶ 30} The state's final witness was East Cleveland Detective D. Shaun Thompson. He testified that he had the opportunity to interview Spates after he was arrested. Spates told Thompson that he received a call from Tiffany Jones telling him that there was a commotion outside of her apartment. He went over to her apartment to make sure her door was locked and then he left. Spates later received another phone call from her, so he went back over to her house, made sure she was okay, and then left again. Spates denied being there when the shooting occurred and stated he was unaware that anyone was shot. Detective Thompson stated that Spates was adamant that a gunshot residue test be performed on his hands, however, the test was not performed because no testing kits were available.

{¶ 31} Spates further explained that he was speeding through the streets to avoid a traffic light. However, according to Detective Thompson, there is no traffic light in the area.

{¶ 32} Detective Thompson testified that he tried to contact the witnesses, but it took several weeks for him to speak to any of them. When he eventually spoke with Bugg, he learned that the shots were fired from a different location than where they searched earlier. Although he searched this new area, nothing was discovered. He also believed he received false information from Woodson.

{¶ 33} Detective Thompson told the jury that a 9mm semiautomatic handgun loaded with two bullets was located the morning after the shooting in a field between Hartford and Milan. The gun was brought into the station and based on the pencil test performed, the gun was deemed operable. DNA tests performed on the firearm were inconclusive. Detective Thompson admitted that he did not recover the gun; thus he had no knowledge of the condition of the gun or whether it was jammed when it was found.

7

*State v. Spates*, 2015-Ohio-1014, ¶¶ 3-33.

These facts "shall be presumed to be correct," unless petitioner rebuts them by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## III.    Relevant State Procedural History

### A.    Trial Court

On August 7, 2013, a Cuyahoga County grand jury indicted Spates on seven counts:  two counts of aggravated menacing, in violation of Ohio Rev. Code § 2903.21(A); two counts of felonious assault, in violation of Ohio Rev. Code §§ 2903.11(A)(1) and (A)(2), each with two firearm specifications; one count of discharge of a firearm on or near prohibited premises – a first degree felony – premised on having caused serious physical harm to Christian Hardrick, in violation of Ohio Rev. Code § 2923.162(A)(3), with two firearm specifications; one count of having weapons while under a disability, in violation of Ohio Rev. Code § 2923.13(A)(3); and one count of tampering with evidence, in violation of Ohio Rev. Code § 2921.12(A)(1).  ECF Doc. No. 9-1 at Page ID# 63-67.

Spates voluntarily waived his right to a jury trial on the weapon under disability charge. ECF Doc. No. 9-1 at Page ID# 71.  The remaining charges were tried to a jury beginning on November 18, 2013.  ECF Doc. No. 9-2 at Page ID# 200.  On November 25, 2013, the jury found Spates not guilty of the Count 5 first degree felony offense of discharge of a firearm on or near a prohibited premises but guilty of the lesser included third degree felony offense thereof, in violation of Ohio Rev. Code002 § 2923.162(A)(3) and (C)(2); not guilty of the Count Three charge of felonious assault under Ohio Rev. Code § 2903.11(A)(2) and the attached firearm specifications; and guilty of all remaining charges.  ECF Doc. No. 9-1 at Page ID# 72.  The trial

court found Spates guilty of having weapons while under a disability.  ECF Doc. No. 9-1 at Page ID# 72.

On December 30, 2013, the trial court conducted a sentencing hearing.  ECF Doc. No. 9-1 at Page ID# 74-75.  The court first merged the Count 5 charge of discharging a firearm on or near prohibited premise and the Count 2 felonious assault charge and the one and three year Page IDfirearm specifications attached to those charges.  ECF Doc. No. 9-1 at Page ID# 75.  The court then sentenced Spates to serve an eight years prison term for felonious-assault charge consecutive to three years on the attached firearm specification; a six month term on each of the two aggravated-menacing charges, to be served concurrently to the felonious assault sentence; a two year term on the weapons-under-disability charge, to be served consecutively; and a thirty month term on the tampering- with-evidence charge, also to be served consecutively.  ECF Doc. No. 9-1 at Page ID# 75.  Spates' aggregate sentence was fifteen years and six months.  ECF Doc. No. 9-1 at Page ID# 75.

### B.      Direct Appeal

Spates, through new counsel, filed a timely notice of appeal in the Eighth District Court of Appeals.  ECF Doc. No. 9-1 at Page ID# 76-86.  Spates presented three assignments of error:

1.      Appellant's convictions are against the manifest weight of the evidence.

2.      The evidence was insufficient to sustain a finding of guilt because the State failed to present evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

3.      Trial court erred in permitting testimony of tests performed on a firearm and for permitting the admission of the firearm as an exihibit [*sic*].

ECF Doc. No. 9-1 at Page ID# 91 (capitalization altered).  On March 19, 2015, the Ohio Court of Appeals affirmed the judgment of the trial court.  ECF Doc. No. 9-1 at Page ID# 140-68; *Spates*, 2015-Ohio-1014.

Spates filed a timely *pro se* notice of appeal to the Ohio Supreme Court.  ECF Doc. No. 9-1 at Page ID# 169.  His memorandum in support of jurisdiction he asserted three propositions of law:

1.      Whether the court loss [*sic*] its way concerning the [m]anifest [w]eight of [t]he [e]vidence.

2.      Whether the court lost its wat [*sic*] concerning the [s]ufficiency [o]f [t]he [e]vidence.

3.      Whether the court lost its wat [*sic*] concerning the [p]encil [t]est.

ECF Doc. No. 9-1 at Page ID# 171.  The Ohio Supreme Court declined to accept jurisdiction of the appeal on July 22, 2015.  ECF Doc. No. 9-1 at Page ID# 185.

### C.      Post-Conviction Proceedings

On October 23, 2015, Spates filed a *pro se* "Motion for Transcripts on the Authority of *Gunner v. Welch*" in the Ohio Court of Appeals.  ECF Doc. No. 9-1 at Page ID# 186-87.  The court denied Spates' motion because his direct appeal was concluded and because post-conviction relief relies on evidence outside the trial-court record.  ECF Doc. No. 9-1 at Page ID# 188.

On December 28, 2015, Spates filed an affidavit of disqualification in the Ohio Supreme Court seeking disqualification of all Eighth District Court of Appeals judges.  *See* ECF Doc. No. 9-1 at Page ID# 189-93.  The Supreme Court denied Spates' request on January 4, 2016.  ECF Doc. No. 9-1 at Page ID# 194.

**IV.    Federal Habeas Corpus Petition**

Spates filed his *pro se* petition for writ of habeas corpus in this Court on May 25, 2016.

ECF Doc. No. 1.  The petition raises a single ground for relief:

> There was no physical evidence.  There was no gun shot residue test conducted.
> There was no shell casings recovered from the scene or from the vehicle.  The
> victim testified that the defendant didn't shoot him.  There was [*sic*] no fingerprints
> or D.N.A. found on the weapon recovered the next morning.

ECF Doc. No. 1 at Page ID# 5.  On July 1, 2016, Respondent filed a return of writ.  ECF Doc.

No. 9. On August 1, 2016, Spates filed a traverse.  ECF Doc. No. 12.

**V.    Standards of Review**

  **A.    AEDPA Review**

Spates' petition for writ of habeas corpus is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v.*

*Ohio*, 551 F.3d 485, 493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. § 2254, was

enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in

capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v.*

*Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436

(2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are

adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have

been adjudicated in state court."  *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs

of habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting

habeas relief with respect to a "claim that was adjudicated on the merits in State court

proceedings" unless the state-court decision either:

11

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on

a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

And "review under § 2254(d)(1) is limited to the record that was before the state court that

adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2)

only if the court made a "clear factual error."  *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003).

As noted above, a habeas petitioner bears the burden of rebutting the state court's factual

findings "by clear and convincing evidence."  *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660

F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness"

AEDPA affords state-court factual determinations, which only can be overcome by clear and

convincing evidence.  28 U.S.C.  § 2254(e)(1).  The Supreme Court has cautioned, "'a state-

court factual determination is not unreasonable merely because the federal habeas court would

have reached a different conclusion in the first instance.'"  *Burt*, 134 S. Ct. at 15 (quoting *Wood

v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by

AEDPA, is an intentionally demanding standard, affording great deference to state-court

adjudications of federal claims.  The Court has admonished that a reviewing court may not

"treat[] the reasonableness question as a test of its confidence in the result it would reach under

*de novo* review," and that "even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable."  *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550

U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the

state court's determination was incorrect but whether that determination was unreasonable – a

substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a

guard against extreme malfunctions in the state criminal justice systems" and does not function

as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.  This is a very high standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be." *Id*. at 102.

**B.  Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were

14

still available.  *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.  In determining procedural default, the federal court again looks to the last explained state-court judgment.  *Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Where a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id*. at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[2]

A petitioner procedurally defaults a claim by failing to "fairly present" the claim in state court when he does not pursue that claim through the state's "'ordinary appellate review procedures,'" and, at the time of the federal habeas petition, state law no longer allows the

---

[2] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

petitioner to raise the claim.  *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review.  *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis.  *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'"  *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).[3]

---

[3] Federal habeas courts review a petitioner's state-court briefs to determine whether he or she fairly presented a claim as a federal constitutional claim, examining the petitioner's:

> "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."

*Williams*, 460 F.3d at 806 (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.*  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.*  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6ᵗʰ Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

### C.    Cognizability

To the extent that claims asserted in a federal habeas petition only allege state-law violations, they are not cognizable on federal habeas review and should be dismissed on that basis.  "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does

not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

However, state-court rulings on issues of state law may rise to the level of due process violations if they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).  Courts, therefore, "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Id.*

**VI.    Analysis**

Spates' sole ground for relief claims that his conviction for felonious assault was not supported by sufficient evidence.  ECF Doc. No. 1 at Page ID# 5.  Specifically, he argues that he "*did not shoot anyone*" and therefore could not have violated the felonious-assault statute under which he was charged, Ohio Rev. Code § 2903.11(A)(1).  ECF Doc. No. 11 at Page ID# 1401 (emphasis original).  He explains:

> [T]here was no physical evidence.  There was no gun shot residue test conducted.  There was no shell casings recovered from the scene or from the vehicle.  Most importantly, the victim testified that Mr. Spates *did not shoot him*.  There were no fingerprints or D.N.A. found on the weapon recovered the next morning.

ECF Doc. No. 11 at Page ID# 1401 (emphasis original).  Without such evidence, he maintains, the State could not prove that he "knowingly caused serious physical harm" to the victim as

required for felonious assault under § 2903.11(A)(1), and the jury therefore convicted him of that charge with insufficient evidence.  ECF Doc. No. 11 at Page ID# 1401-02.  The Ohio Court of Appeals adjudicated this claim on Spates' direct appeal.  *See* ECF Doc. No. 9-1 at Page ID# 91, 171, 185; *State v. Spates*, 2015-Ohio-1014, ¶¶ 51-62.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979).  Habeas courts reviewing insufficient evidence claims must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. at 319 (emphasis original).  "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Because both *Jackson* and AEDPA apply to Spates' sufficiency claim, federal habeas review requires deference at two levels.  "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  The Sixth Circuit has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'"  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

After accurately stating the law regarding insufficient evidence claims, the state appellate court, the last state court to address this claim, reasoned:

{¶ 51} In Count 2, Spates was charged with felonious assault in violation of R.C. 2903.11(A)(1), which provides in relevant part that "[n]o person shall knowingly cause serious physical harm to another." The indictment named "Christian Hardrick" as the victim.

{¶ 52} Spates contends that the evidence was insufficient to demonstrate that Spates knowingly caused physical harm to Hardrick because there was no direct evidence that he shot Hardrick. However, the State proceeded under the theory of natural consequences of Spates's actions and intervening causes to prove that Spates was responsible for the harm caused to Hardrick.

{¶ 53} The jury received the following instructions on natural consequences and intervening causes:

> ***Natural consequences***. The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or failure to act.

> ***Intervening causes***. The defendant is responsible for the natural consequences of the defendant's unlawful act or failure to act even though serious physical harm was also caused by the intervening act or failure to act of another person or agency.

{¶ 54} "'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' "*State v. Conway*, 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). An accused need

20

not foresee the precise consequences of his conduct. *State v. Smith*, 4th Dist. Ross No. 06CA2893, 2007–Ohio–1884, ¶ 29. "To be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct." *Id*., citing *State v. Losey*, 23 Ohio App.3d 93, 96–97, 401 N .E.2d 379 (10th Dist.1985).

{¶ 55} In *Smith*, the Fourth District discussed intervening causation and when a defendant is responsible for intervening actions. If the defendant has brought the intervening agency into play in response to the danger the defendant has caused, the defendant is subject to liability, unless the intervening response is abnormal and unforeseeable. *Id*. at ¶ 20, citing *LaFave Substantive Criminal Law* (2003), 2d Ed., Section 6.4(C).

{¶ 56} In *State v. Johnson*, 4th Dist. Scioto No. 13CA3580, 2014–Ohio–4443, the court applied and analyzed the concepts of natural and foreseeable consequences and intervening causes as discussed in its prior opinion in Smith. In that case, Johnson was charged with felonious assault of a prison guard. The incident began when Johnson pushed the prison guard and then punched him three or four times in the head. The victim then grabbed Johnson and tried to gain control of the situation by taking Johnson to the ground. When they fell to the ground, Johnson landed on top of the victim. The victim struck his head, shoulder, and arm on the ground, causing multiple injuries including a closed-head injury and a shoulder injury requiring surgery.

{¶ 57} On appeal, Johnson argued that he did not knowingly cause serious physical harm to the victim because the injuries were a result of the altercation that ensued after Johnson punched the victim. Specifically, he claims that the victim's actions constituted an unforeseen intervening act that caused the serious physical harm suffered by the victim.

{¶ 58} The Fourth District disagreed and concluded that Johnson could have reasonably foreseen that his unprovoked attack on a prison guard would result in the guard attempting to restrain Johnson by taking him down to the ground. *Id*. at ¶ 20. Accordingly, the victim's injuries were consequently reasonably foreseeable to Johnson and they would not have occurred if Johnson had not started the altercation by punching the victim. *Id*.

{¶ 59} Applying the principles and reasonings of the Fourth District to the case before this court, Hardrick's injury was reasonably foreseeable to Spates and would not have occurred if Spates had not started the altercation by threatening

various individuals, announcing he was going to get his friends, brandishing a gun, and then instigating and inviting a confrontation. It is without question that Spates set into motion the sequence of events that evening.

{¶ 60} Assuming that another individual actually shot Hardrick, which constitutes an intervening act, it was a reasonable and foreseeable consequence of the initial instigation and invitation by Spates, including waving a firearm around, shouting obscenities, and threatening that people were going to die. Because the shooting was instantaneous, there was no break in the chain of causation to relieve Spates from criminal liability for felonious assault related to the serious physical injury incurred by Hardrick when he was shot.

{¶ 61} As the jury was properly instructed, despite the existence of another possible cause of Hardrick's injury, Spates was "'responsible for the natural consequences of his actions and the multiple causes are not a defense.'" *Johnson*, 4th Dist. Scioto No. 13CA3580, 2014–Ohio–4443 at ¶ 23, quoting *State v. Nichols*, 11th Dist. Lake No.2005–L–017, 2006–Ohio–2934, ¶ 50.

{¶ 62} Therefore, viewing the evidence in the light most favorable to the state, sufficient evidence existed to support Spates's conviction for felonious assault in violation of R.C. 2923.11(A)(1).

*Spates*, 2015-Ohio-1014, ¶¶ 51-62.

Thus, the state appellate court specifically addressed the same insufficient evidence claim Spates raises here.  It acknowledged "there was no direct evidence that [Spates] shot Hardrick." *Spates*, 2015-Ohio-1014, ¶ 52.  But it explained that "the State proceeded under the theory of natural consequences of Spates's actions and intervening causes to prove that Spates was responsible for the harm caused to Hardrick."  *Id.*  The court proceeded to explain those theories under Ohio law and apply that law in a straightforward manner to the facts of Spates' case, which it had thoroughly presented.  It found "Hardrick's injury was reasonably foreseeable to Spates and would not have occurred if Spates had not started the altercation by threatening various individuals, announcing he was going to get his friends, brandishing a gun, and then instigating and inviting a confrontation."  *Id.* at ¶ 59. The court concluded, "It is without question

that Spates set into motion the sequence of events that evening." *Id.* The court further explained that even "[a]ssuming that another individual actually shot Hardrick, which constitutes an intervening act, it was a reasonable and foreseeable consequence of the initial instigation and invitation by Spates, including waving a firearm around, shouting obscenities, and threatening that people were going to die. Because the shooting was instantaneous, there was no break in the chain of causation to relieve Spates from criminal liability for felonious assault related to the serious physical injury incurred by Hardrick when he was shot." *Id.* at ¶ 60. The court noted that the jury was properly instructed on the law regarding the theories of natural consequences and intervening causes, and determined that under those theories, there was sufficient evidence supporting Spates' conviction for felonious assault. *Id.* at ¶¶ 61-62.

Spates offers no evidence or argument to refute the state appellate court's careful and reasonable analysis of this claim and its rejection of his contention that without physical evidence proving that he was the one who shot Hardrick, the State could not prove that he "knowingly caused [him] serious physical harm." This Court must defer to, and is bound by, the state appellate court's interpretation of Ohio law regarding the theories of natural consequences and intervening causes and their application to a charge of felonious assault. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus") (citing *Estelle*, 502 U.S. at 67-68). And it must presume the state court's findings of fact are correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Given the applicable Ohio law, and viewing the evidence in the light most favorable to the prosecution, a "rational trier of fact could have found the essential elements of [felonious assault] beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. And the state appellate court reasonably

23

determined that Spates' conviction for that offense was supported by sufficient evidence.  Like Spates, many persons convicted of crimes they don't feel they directly committed object to being found guilty on an imputed liability theory such as aiding and abetting or natural consequences. But the law allows such theories so that all those who are responsible for contributing to the commission of criminal acts may be held responsible.  That is what happened to Brandon Spates here, whether he agrees with that policy or not.

Accordingly, Spates has not established that the state court's decision rejecting his insufficiency claim was contrary to, or an unreasonable application of, *Jackson.*  Nor has he shown the decision constituted an unreasonable determination of the facts.  The undersigned therefore recommends that the Court deny Spate's sole ground for relief on the merits.

## IV.   Recommendation

Because Spates' sole claim for habeas relief lacks merit, I recommend that the Court DENY Spates' petition in its entirety.

.

Dated: September 13, 2017

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file

24

objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).